[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON THE DEFENDANT CONDEMNEE'S MOTION IN LIMINE TOPRECLUDE EVIDENCE AND TESTIMONY CONCERNING ENVIRONMENTAL CONTAMINATIONOR COSTS OF REMEDIATION IN AN EMINENT DOMAIN VALUATION TRIAL
The named defendant, ATC Partnership (ATC), has taken this appeal from a statement of compensation in the amount of one dollar ($1.00) filed by the plaintiff, Northeast Economic Alliance, Inc. (NCEA), acting as the statutory implementing agency and condemning authority for the town of Windham, in connection with the taking by eminent domain of a parcel of land owned by ATC in that town, consisting of about forty acres, which had been owned and operated by the American Thread Company (American Thread), as a textile mill for many years until 1985. At the commencement of the trial, ATC filed a motion in limine to preclude evidence of environmental contamination or cost estimates for remediation, and the parties were directed to brief the question of whether evidence of that nature should be admitted as part of the eminent domain valuation trial over the CT Page 4415 objection of the defendant condemnee.
The necessary factual predicate for the court's determination of the issues raised by the defendant's motion to preclude is principally based on a written stipulation filed by counsel for that purpose, supplemented by other underlying facts which are essentially undisputed, and may be summarized as follows. American Thread had been engaged for many years in the making of thread, yarn and string products at its mill complex in the Willimantic section of Windham until 1985, when it ceased its manufacturing operations at the site and sold the property to Eastern Connecticut Industrial Park Associates (Eastern Connecticut), on December 5, 1985. Prior to that conveyance, a release of hazardous waste had occurred at the site, and the transferor, American Thread, filed a so-called "Form III" pursuant to the Connecticut Transfer Act (presently codified as sections 22a-134a through 22a-134d of the General Statutes) in which it certified that it would remediate the hazardous waste discharge as required by, and subject to the approval of, the department of environmental protection (DEP).
Eastern Connecticut sold the site to ATC in 1987 for 2.7 million dollars, but it made no Transfer Act filing in connection with that conveyance, and no manufacturing was done at the site during the period of the defendant's ownership of the property from 1987 until September of 1994 when NCEA took the property by eminent domain as agent for the town pursuant to § 32-224 of the General Statutes. Prior to the condemnation, assessments of the property showed that numerous areas of environmental concern were still present, including large amounts of asbestos, lead paint, polychlorinated biphenyls (PCBs) and oil contamination.
Prior to, and at the time of, the taking, NCEA and the town possessed detailed information about the environmental conditions of the property, based upon a comprehensive Phase I assessment conducted by an environmental consulting firm, Advanced Environmental Interface, Inc., whose report of its investigation of those conditions was submitted in October of 1993, nearly a year before the taking. A subsequent report was also provided by another consultant, HMM/Earth Tech, that had been retained by NCEA in June of 1994, and both reports were a matter of public record at the time of the taking on September 9, 1994, and all of the parties were aware of the contents of those studies prior to the taking. CT Page 4416
A Form III certification was made by the town as transferee after the date of the taking, which stated that ATC, the transferor, was "unable to submit a negative declaration [because the] property was taken by eminent domain, involuntarily." Subsequently, on November 10, 1994, the town transferred all of its right, title and interest in the site by quitclaim deed to Windham Mills Development Corporation (Windham Mills), and the Form III certification by Windham Mills stated. that a negative declaration could not be provided by the town because it had "acquired the property by eminent domain as part of [a] regional redevelopment plan supported by the State of Connecticut [and that a] site investigation is currently being performed."
Subsequent to the taking, Windham Mills demolished several of the buildings in the complex and has engaged in the management or various substances, including asbestos, lead and PCBs, as well as petroleum contamination. The purpose of the taking was to promote economic development in the area pursuant to the Connecticut Economic Development and Manufacturing Assistance Act of 1990, General Statutes § 32-220 et seq., which expressly authorizes an "implementing agency" such as NCEA to condemn "any real property necessary or appropriate" for a proposed municipal development project that has been approved by the commissioner of economic development. General Statutes § 32-224 (g).
On the date that had been scheduled for the commencement of the valuation trial, counsel orally argued their respective claims of law in support of, and in opposition to, ATC's motion in limine. Thereafter, the court made a preliminary ruling from the bench that evidence of cost estimates for the remediation of the environmental contamination that admittedly existed on the subject property at the time of the taking, would be excluded in the first phase of the hearing, that the parties would proceed to present their evidence, including the testimony of their appraisers and other witnesses, as well as documentary evidence (subject to the evidentiary exclusion ordered by the court in its ruling on the defendant's motion), and that the court would then make a final definitive ruling after its review of the factual record and the legal claims made by the parties on the question of whether the plaintiffs' offer of proof as to the environmental remediation costs incurred by Windham Mills should be permitted under the particular facts and circumstances of this case.
The court's reasons for its preliminary ruling and the legal authorities upon which it relied were fully articulated on the CT Page 4417 record, and were based in part on Chapter 13B of Nichols on Eminent Domain, published in April, 1996, entitled "The Taking of Environmentally Contaminated Property", that includes one section which is devoted entirely to an analysis of the arguments for and against the admission of evidence of contamination in an eminent domain trial; 7A Nichols, Eminent Domain (3rd Ed. Rev. 1996) § 13B-03, p. 86-121; as well as to the question of whether or not an award of just compensation should exclude any offset for environmental remediation. Id. § 13B.01, p. 4-7. The text writer's conclusions are that although different principles may apply where there is no objection to its admission or where both parties seek to introduce such evidence, where there is an objection to such an offer of proof, "[a]ll evidence of contamination should be excluded from the eminent domain valuation trial [and the] amount of compensation that is `just' is an award that makes no offset by reason of the contamination [because contamination] is a separate matter and should be tried separately." Id.
One of the cases cited in the Nichols treatise as authority for the conclusion that environmental cleanup costs may not be deducted from the judicially determined sum that constitutes "just compensation" in the federal and state constitutional sense, is an unreported Connecticut case in which the trial court refused to allow an offset in favor of the condemning authority for the cleanup costs that it claimed had been incurred, and based its decision on a number of grounds, including the existence of other statutory remedies for cost recovery, the fact that condemnation forces an owner to sell while property is in a contaminated state, the absence of proof that the condemnee was at fault or otherwise legally liable for those costs, the limited scope of an eminent domain valuation trial, and the equitable nature of condemnation proceedings. Id. p. 13B-129 (citing Murphyv. Town of Waterford, Superior Court, judicial district of New London at New London, Docket No. 520173 (July 9, 1992) (Healey, STR) (1992 WL 170588). Although evidence of contamination was undisputed in that case, and no objection was taken to the admission into evidence of the cost of remediation, former Justice Healey, who was the trial referee, nevertheless held that "the defendant town cannot require the reduction, in thisparticular proceeding, of the amount determined to constitute just compensation for this taking." (Emphasis added.)
The plaintiffs filed supplemental briefs in response to the court's preliminary ruling on the motion in limine, which was CT Page 4418 made without prejudice to further argument and briefing by the parties concerning the applicability, under the facts of this case, of the Murphy decision, as well as the validity under Connecticut case law of the conclusions reached in Nichols in its most recently published and comprehensive treatment of the subject, namely, that where a timely objection is made by the condemnee, all evidence of contamination should be excluded from the eminent domain valuation trial, and that "just compensation" within the meaning of the state and federal: constitutional taking clauses is an award that makes no offset by reason of the contamination. The condemnors' principal contention is thatMurphy is factually distinguishable, because in that case the town of Waterford sought to reduce the "already judicially determined" fair market value by the amount the condemnee would have been liable to pay in a state or federal statutory recovery action, while the plaintiffs in this case are offering the "condition" of the property only insofar as it affects fair market value and not for the purpose of determining liability, and that the testimony of the plaintiffs' appraiser in this case, unlike that offered in Murphy, gave appropriate consideration to the environmental factors in reaching his conclusion as to the value of the property.
The facts in Murphy as they relate to the factual and legal claims made by the plaintiffs may be summarized as follows. The property that was the subject of the taking was a gas station that had been built in 1950 and purchased by Murphy's predecessor in title, Kennedy, in the 1970's, but which was not utilized as such or for any other purpose by either owner, and had been boarded up and unused for at least fifteen years prior to the filing by the town of a statement of compensation in the amount of $35,000 on April 25, 1991. The town's appraiser testified that the fair market value of the property as of that date was $35,000, and the condemnee's appraiser valued the property at $65,000, but neither appraiser, as noted by the court in its memorandum of decision, considered the evidence of ground contamination that was discovered shortly after the taking despite the fact that they both knew of the original use of the property and that "the potential for [ground contamination] is readily suggested, even to a layman, where premises have been used as a gasoline station."
The plaintiffs claim that Murphy is distinguishable because in that case the town sought to reduce the "already judicially determined" fair market value by the amount that Murphy might be CT Page 4419 required to pay in a statutory cost recovery action, and it is apparently based on the fact that the Murphy court had concluded that the property had a fair market value of $45,000 in Part II of its opinion, but chose to defer its discussion of the issue of cost reimbursement to the following section in which it stated that before "judgment may be entered in this matter" another issue would have to be resolved, namely, the town's claim that environmental contamination was a factor which would be considered by a willing and knowledgeable seller and a willing and knowing buyer in arriving at the fair market value of the property. The town's argument, as stated by the court was that the condemnee "is responsible in this proceeding for the $4,732.44 already expended for cleanup [and in] doing so, the defendant town advances no authority for the proposition that it is entitled, in this condemnation proceeding, to require that the amount found to constitute just compensation due the plaintiff be reduced as claimed. . . ", and concluded that based on constitutional grounds and equitable considerations, the factual circumstances in Murphy "definitely militate against permitting, if it could ever be the case, of(sic) reducing the just compensation constitutionally due this plaintiff in thisparticular proceeding." (Emphasis added.)
The conclusions reached by the only Connecticut court to have considered and ruled upon some of the issues raised by the defendant's motion in limine in this case, therefore, clearly support the view that the question is not the admissibility per se of such evidence, but rather the "justice" of admitting it, because the controlling principle in a condemnation trial is the constitutional guarantee of "just compensation" for the condemnee, while the goal of environmental law is the enforcement of the liability for remediation expenses against potentially responsible parties under state and federal law, without regard to equitable considerations. 7A Nichols, supra, p. 13B-4 n. 3; Id. § 13B.03(2)(b). In Murphy, the court recognized the mutual independence of these two separate and distinct legal fields, and concluded that despite the fact that evidence of contamination and the costs of remediation were already before the court, they should nevertheless be excluded from the eminent domain valuation trial because those issues would have to be litigated and determined in a statutory environmental cost recovery action brought by the party who has incurred those costs. Id. p. 13B-92.
Under Connecticut case law, it has long been recognized that CT Page 4420 what is being valued in an eminent domain action is the property itself rather than the possible in personam liability of those who are affected by the taking, and that the adjudication of any such rights or obligations claimed by those who have or may have had an interest in the property do "not properly apply to a proceeding in rem to condemn land for a public use." Stevens v.Battel, 49 Conn. 156, 162 (1881). On the other hand, environmental liability under federal environmental statutes such as the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 et seq. (CERCLA), and related state statutes is in personam, because it attaches personally, as well as jointly and severally, to the owner and other potentially responsible parties (PRPs). 7A Nichols, supra, p. 90.
Our case law has also recognized that a condemnation proceeding is limited in scope and that matters which purport to impose personal liability upon the owner in order to reduce the award will not be entertained because "[w]hatever action the [condemnor] may have against the [condemnees] must be raised in an independent proceeding." Rice v. Ives, 27 Conn. Sup. 23, 27-28
(1966). Moreover, the trial court's jurisdiction in a condemnation proceeding is limited to the assessment of damages and there is no statutory authority given to the court on such an appeal to decide questions of individual liability or contribution, and any such issues between the parties must be resolved in a separate action. See Greene v. Burns,221 Conn. 736, 750-51 (1992).
The plaintiffs' principal claim in this case is that their offer of proof is not an attempt on their part to inject into the valuation trial extraneous issues of liability for cleanup costs or for contribution; or the apportionment of those costs by or between the responsible parties, but is merely for the purpose of presenting relevant evidence of the "condition" of the property only as it affects market value. This claim, that is referred to in Nichols as the "property characteristic" argument; 7A Nichols,supra, § 13 B.03 [3][b], has been the basis for the admission of contamination evidence in a number of cases; see e.g.:Redevelopment Agency v. Thrifty Oil Co., 5 Cal.Rptr.2d 687
(Cal.App. 1992); Olathe v. Stott, 861 P.2d 1287, 1288 (Kan. 1993); Tennessee v. Brandon, 898 S.W.2d 224 (Tenn.App. 1994); and the rationale for those decisions has been that "contamination is a condition of the property itself that is similar to other conditions which are commonly taken into account CT Page 4421 in eminent domain valuation, such as the dilapidated nature of improvements or soil instability on the subject property." 7A Nichols, supra, p. 13B-108.
The "property characteristic" argument advanced by the plaintiffs in this case has been expressly rejected by an Illinois appellate court in its response to a question certified to it by the trial. court in a case very similar to this one, both factually and procedurally, where the trial court had granted the condemnee's motion to bar all testimony concerning environmental contamination from the condemnation trial after an earlier preliminary "quick take" proceeding in which the condemning authority, as was done by the plaintiffs in the initial evidentiary phase of this case, had offered appraisal testimony that the property had no value because the remediation costs claimed were greater than the appraiser's opinion of the market value of the property. Department of Transportation v.Parr, 633 N.E.2d 19, 20-21 (III. App. 1994). The court's answer to the question of law certified to it by the trial court was that "environmental remediation costs, standing alone, have no direct bearing on the valuation of the condemned property [and that] the admission of [such] costs into evidence would violate the due process rights of property owners under the Illinois Environmental Protection Act." Id. 20.
The principal argument made by the condemning authority inParr against the exclusion of evidence of remediation costs was based on the Illinois Eminent Domain Act which expressly allowed the admission into evidence in an eminent domain trial of "any unsafe, unsanitary, substandard or other illegal condition, use or occupancy of the property [and] the reasonable cost of causing the property to be placed in a legal condition, use or occupancy. . . notwithstanding the absence of any official action taken to require [its] correction or abatement . . . ". (Emphasis added.) 735 ILCS 5/7-119 (West 1992); Id. 21-22. The court held that even if environmental remediation costs were admissible in an eminent domain valuation proceeding under the statute, as claimed by the Illinois Department of Transportation (IDOT), the admission of such costs would deprive the condemnee of the procedural safeguards, rights and defenses provided in the Environmental Protection Act, including the right to require proof of the condemnee's liability under the Act and the right to implead potentially responsible third parties, thereby violating the procedural due process rights of owners of condemned property and concluded that [w]e cannot allow IDOT to achieve such a CT Page 4422 result." Id. 23.
The most recently reported decision dealing with the issues raised by ATC's motion in limine is Aladdin, Inc. v. Black HawkCounty, 562 N.W.2d 608 (Iowa 1997), in which the Supreme Court of Iowa held that the admission of remediation costs and the reduction of that amount from the fair market value found by the condemnor's appraisers based on the assumption that the property was "environmentally clean", deprived condemnees of their procedural due process rights under that state's environmental protection laws. Under the Iowa statutes, the owner of contaminated property has possible legal liabilities for the creation or maintenance of that condition, but where the property is condemned and its value reduced by the estimated cost of cleanup, "the landowner will not receive just compensation because the award will be less than full value [and in] addition, the property owners will still have the same legal liability for cleanup costs as before." Id. 615.
"A property owner has a right to have its liability established in a legal proceeding in which the owner has the opportunity to show that the owner did not cause the water pollution or hazardous condition." Id. If the owner is proved to be legally liable in such an environmental remediation cost recovery action, those costs can be recovered from the owner after the condemnation proceeding has been completed, thereby preventing condemnees from having their potential liability adjudicated in an eminent domain proceeding without the safeguards provided by the statutory procedures for recovering such costs. Id.
The Connecticut statute that provides for environmental remediation cost recovery, General; Statutes § 22a-452(a), unlike CERCLA, its federal counterpart, which imposes strict liability for hazardous waste violations, requires the party seeking reimbursement to prove that the contamination resulted from the other party's negligent conduct and there can be no reimbursement for such costs unless the plaintiff has established these two essential elements of culpability and causation.Connecticut Resources Recovery Authority v. Refuse Gardens, Inc.,43 Conn. Sup. 83, 90, 9 CONN. L. RPTR. 77 (1993), aff'd,229 Conn. 455 (1994). The undisputed facts of this case, insofar as they relate to the issues of fault and causation for the purposes of recovering environmental remediation costs, are not materially different from those in Murphy v. Town of Waterford,supra, and it is CT Page 4423 therefore reasonable to assume that if the plaintiffs in this case had asserted and pursued a cost recovery claim under §22a-452(a), as the condemnor attempted to do in Murphy, that they would likewise have been unable to prove their "entitlement to reimbursement in this proceeding under this statute", and that any such claim for reimbursement would have been rejected by the trier of fact, even if such a cause of action could have been alleged and proved in the context of an eminent domain proceeding. Id.
The plaintiffs' argument in their supplemental brief is thatMurphy, Aladdin and Parr, the cases relied upon by the court in its initial ruling, are distinguishable because the condemning authority in each of those cases was seeking to impose liability on the condemnee under the applicable cost recovery statute, while the town's offer of proof in this case, should the court reconsider its prior ruling and allow such further evidence, will be limited to the testimony of environmental experts as to the nature and extent of the contamination and the costs of the remediation procedures that will be required, in order for the court to determine what weight should be given to the opinion of the plaintiffs' appraiser that the property had no market value because of the magnitude of those costs. The town's offer of proof also states that although it considers such evidence "to be irrelevant to this proceeding", it will offer evidence, if the court deems it to be relevant, to show that the town "did not expend any money on actual remediation of these conditions, and that it sold the property for one dollar to [Windham Mills], a private, non-profit corporation, in November of 1994."
The plaintiffs' offer of proof and their arguments in support of its allowance is similar, at least in certain respects, to those made by the condemnor in Finkelstein v. Department ofTransportation, 656 So.2d 921 (Fla. 1995), where the state's Department of Transportation (DOT), the taking authority, made a proffer of the same kind that was rejected by the trial court, but was allowed on appeal and remanded to the trial court, subject to certain conditions imposed by the; Florida Supreme Court, on the ground that the evidence could be found by the trial court to be relevant and admissible under the particular facts and circumstances of that case if the required "factual predicate" was established. Id. 925. The most significant factors that led to that result and which are not present in this case are, first, that the DOT's appraiser expressed the negative impact of the environmental contamination on the property in CT Page 4424 terms of twenty to twenty-five percent of its market value, second, that the DOT expressly stated in its brief that it did not seek a mathematical setoff from the value of the property based upon the costs of remediation, third, that a determination of liability for the contamination was not an issue in the case, and finally, that the court's holding that remediation costs were relevant was based exclusively on the fact that there was a state program for the reimbursement of remediation costs to owners of contaminated property. Id. 923-24.
Where the fact of contamination is undisputed, "[t]he focus of the opinion testimony must be value [and evidence] of contamination . . . should not be a feature of a valuation trial beyond what is necessary to explain facts showing a reduction in value caused by contamination." Id. 925. Moreover, an appraiser's opinion as to a decrease in value "cannot be a mere surmise that because property is contaminated, it logically follows that the value of the property is decreased [and if] there is no evidence in the record upon which the fact finder can determine that the value of the property has been decreased, then the [condemnee] would be entitled to the fair market value of the property valued as uncontaminated." Id.
In a recent law review analysis and critique of theFinkelstein decision, the author concludes that even in those cases where evidence of contamination and cleanup costs has been found relevant and therefore admissible in an eminent domain proceeding, the established method of proof must be followed in that the trier, in the evidentiary phase of the hearing, must rely exclusively on the opinions of valuation experts rather than those of contamination or environmental experts, particularly where the general nature and extent of the condition is essentially undisputed by the parties. Note, 20 Nova L. Rev. 951, 967 (1996). The purpose of this evidentiary exclusion is to prevent such proceedings "from becoming a forum in which to resolve complicated environmental issues and present lengthy and complex expert testimony" and documentary evidence which may be only peripherally related to the central issue of value and the ultimate issue of just compensation, and the evidence "must necessarily be limited to the market-based effects of contamination on value, if any." Id.
The court in Finkelstein expressly placed the burden of proving any decrease in the value of contaminated property upon the condemning authority and imposed the evidentiary precondition CT Page 4425 that "[t]here must be a factual basis through evidence of sales of comparable contaminated property upon which to base a determination that contamination has decreased the value of the property." Finkelstein v. Department of Transportation, supra, 925. The court's preference for the market data approach has been criticized because of the inherent difficulty involved in identifying and analyzing sales of comparable contaminated property, and even if such sales are found, "an appraiser may not be able to isolate a specific and quantifiable value decrease based on the data [although the] court's decision [is also] broad enough to allow for alternate methods of valuing contaminated property." Note, supra, 20 Nova L. Rev. 966.
It should be noted in this connection that the practical difficulties involved in using the comparative sales method in the valuation of contaminated property was one of the reasons given by the court in Aladdin for its conclusion that considerations of public policy in addition to its concerns about the due process rights of condemnees, justified the total exclusion of expert environmental evidence from valuation trials, not only because of the state's interest under its environmental protection laws to have cleanup costs assessed against, and recovered from, those who were in fact responsible for the contamination, but also because the time, expense and complexity of litigating the reasonableness of the methods and costs of remediation and the unsuitability of the market approach in such cases "would spawn more litigation and would cause additional delay and expense, which serves neither judicial economy or finality." Aladdin v. Black Hawk County, supra, 616. The court stated that "[t]he traditional expert testimony as to fair market value based on comparative sales would be unavailable in most instances because of the difficulty in locating `comparable' contaminated property sales [because such properties] involve multiple varieties of varying concentrations and require assorted methods of cleanup", thereby making the determination of just compensation vulnerable to successful legal challenge on appeal as being based on speculation and conjecture.Id.
The plaintiffs' offer of proof that was submitted on November 24, 1997, together with their supplemental brief in response to the foregoing cases and secondary materials that were cited by the court in its preliminary ruling, consists almost entirely of a proffer of expert environmental testimony concerning the various types of contamination and the methods required for their CT Page 4426 remediation, despite the fact that the condemnee has stipulated that it was fully aware of the contents of the detailed and comprehensive environmental studies and assessments that had been made prior to the taking. The expert valuation evidence was to be offered through two qualified appraisers who would make "adjustments corresponding to the effects of these conditions on the market value, and that there were comparable sales of property that had conditions that had been `cleaned' and for which adjustments were made by the appraiser [and that their] professional standards, when determining market value, allow them to factor conditions like these into their opinions of value."
The plaintiffs chose to call only one of their appraisers, Dean Amadon, who utilized the sales comparison approach because, as he stated in his report (page 59), "it is generally the most easily understood valuation method and it is the method typically used by potential purchasers of old multistory, mill-type industrial facilities such as the subject." The plaintiffs correctly point out in their brief that the particular method of appraisal goes to the weight, if any, which the court may ultimately give to the valuations of the respective appraisers, and the trier may accept the method or methods that he finds to be appropriate under the circumstances of the particular case.Slavitt v. Ives, 163 Conn. 198, 209 (1972).
The subsequent procedural history of the Finkelstein case, however, is of some significance in connection with the appraisal testimony that was actually given by the plaintiffs' valuation expert in this case, because after the remand to the trial court for a full hearing of the expert environmental and valuation testimony whose exclusion had been the subject of the ultimate appeal to the Florida Supreme Court, the trial court found that the evidence was not admissible and the offer of proof was rejected. Note, supra, 20 Nova L. Rev. 960-61 (Department ofTransportation v. Finkelstein, No. 90-0653-19 (Fla. Broward County Ct., October 9, 1995). The basis for the trial court's ruling was that the appraiser had acknowledged that his opinion was not based on any comparable sales that reflected market value and that none of those transactions were sales of similarly contaminated property which had been successfully cleaned when compared to the subject property, as mandated by the Supreme Court in its decision. Id. (Hearing Transcript, 102-121).
The most recently published legal materials on the subject of the valuation of contaminated property in eminent domain trials CT Page 4427 have recognized that since the conditions and circumstances of each case are unique, experts predictably disagree on the question of value regardless of which one of the traditional methods are utilized for reaching an informed opinion as to value. 7A Nichols, supra, § 13B.04[1][a]. The use of the simplest technique, the comparable sales approach, is complicated by the fact that even where there may be two similarly situated and "equally contaminated parcels, the sales price may be greatly affected by provisions in the real estate contract which allocate responsibility for future environmental problems and provide for various indemnifications between the buyer and seller [or where the sale was negotiated] according to different regulatory controls or scientific knowledge in effect at the time of purchase." 60 Am.Jur. Trials 447 at 496 (1996).
The plaintiffs' offer of proof, as stated previously, indicated that their expert appraisal witnesses would utilize comparable sales of property that had been "cleaned", making adjustments based on the effects of the contaminated condition of the property on its market value and that the professional standards followed by appraisers "allow them to factor conditions like these into their opinions of value." They also stated in their supplemental brief that they would not attempt to reduce the value of the property by the cost of cleanup on a dollar-for-dollar basis as the appraisers in Aladdin had done, because they would "offer more than just evidence as to costs" in that their appraisers would testify "that they considered the existence and severity of the existing conditions . . . in determining the fair market value of the subject property."
The professional standards for real estate appraisers that were to be relied upon by Amadon in making his valuation are the Uniform Standards of Professional Appraisal Practice (USPAP), and the particular standards of USPAP that relate to the appraisal of contaminated property, Advisory, Opinion AO-9 and Guide Note 8, were offered by the plaintiffs and admitted into evidence at the hearing. The Advisory Opinion states that "[a]n appraiser may reasonably rely on the findings and opinions of qualified specialists in environmental remediation and compliance cost estimation [but that the] value of an interest in impacted or contaminated real estate may not be measurable by simply deducting the remediation or compliance cost estimate from the estimated value as if unaffected . . .", and the Guide Note also states that "[t]he appraiser is cautioned that the value of a property impacted by hazardous substances may not be measurable CT Page 4428 simply by deducting the typical remediation cost [and in] any analysis the appraiser should concentrate on estimating the effect on value caused by the hazardous substances."
Amadon's report of his appraisal (p. 58) states that his opinion of the "final value" of the; property based upon the sales comparison approach was $850,000 "free and clear of environmental hazards", but he concludes nevertheless (p. 60) that "the market value of the fee-simple estate of the subject property . . . has no value [because the] cost to cure the environmental hazards is in excess of our opinion of the value of the premises as though free and clear of environmental hazards . . .", and the handwritten notes on the final draft state that "[b]ased upon the cost to cure estimate . . . there is no value estimate for the subject property." He testified that the estimate of the remediation costs was not received until the report was being finalized and that although he had been aware of the environmental conditions of the property, he made no deductions or adjustments for cleanup costs, nor was any reference made in the body of his report to the market-based effects of contamination on value because the quantification of the cost estimates was not available to him until the "eleventh hour", and he also stated that the dollar amount of those costs was the only information that he needed in order to reach the conclusion stated in his report.
The defendant objected to the admission of the letter that quantified the estimated cleanup costs because although it might be relevant under the Finkelstein guidelines, the plaintiffs had failed to establish the requisite "factual basis through evidence of sales of comparable contaminated property upon which to base a determination that contamination has decreased the value of the property." Finkelstein v. Department ofTransportation, supra, 925. The objection was overruled on the ground that it was for the court as the trier of fact to determine whether the appraiser's opinion that the property had no value was an independent professional judgment on his part that was sufficiently supported by the "factual predicate" that is a condition precedent for its admissibility under Finkelstein.
Even if it were to be assumed that the very narrow holding inFinkelstein and the rather unique underlying facts and circumstances upon which it was based support the claim that evidence of contamination is relevant to valuation under the facts of this case, the appraisal evidence that was actually CT Page 4429 presented to the court (rather than being merely proffered to the trial court as it was in Finkelstein) through the plaintiffs' appraiser was, by his own admission, not based on sales of similarly contaminated property which had been successfully cleaned and compared with the subject property as represented in the plaintiffs' offer of proof that was made prior to his testimony. Moreover, their representation that they would not reduce Amadon's valuation on a dollar-for-dollar basis and would "offer more than just evidence as to costs" is not reflected in the actual testimony given by the only valuation expert that they chose to call as a witness.
The plaintiffs assert in their supplemental brief that their appraiser utilized an "acceptable methodology" when he offset the estimated cleanup cost from his hypothetical "clean" value of the property, despite the Murphy court's rejection of the so-called "dollar-for-dollar discounting approach" based on constitutional grounds and equitable considerations, and particularly in view of the fact that the remediation cost claimed by the town in that case was only a small fraction of the fair market value of $45,000 found by the trial referee. The use of this approach, even in cases where remediation costs have been admitted in evidence, has been strongly criticized because it enables the condemnor to reduce "the amount of just compensation by a full dollar [and gives an] incentive for government to rely on this method, instead of being able to deduct merely the present value of each dollar to be spent on cleanup [and is only] appropriate where the property is being j taken specifically for the purpose of cleanup; or where, regardless of the taking, the contamination poses so imminent a hazard that it would in any event have been cleaned forthwith." 7A Nichols, supra, p. 13B-139, 140.
The plaintiffs' methodology has been expressly rejected in the context of the valuation of contaminated industrial property for tax purposes by the New Jersey Supreme Court in the case ofInmar Associates, Inc. v. Borough of Carlstadt, 549 A.2d 38 (N.J. 1988) in which the court held that the method for determining the market value of such property "is not simply to deduct the cost of the cleanup from a putative value of the property." Id. 43. There are at least two reported Connecticut trial court decisions involving appeals from tax assessments that have cited that case with approval as authority for the rejection of arguments made by property owners that the valuation of their property should be reduced dollar for dollar by the estimated costs of cleanup to reflect the fact that they had no market value "because no buyer CT Page 4430 would ever purchase them." Burnette v. Somers, Superior Court, judicial district of Tolland at Rockville, Docket No. 55821 (June 27, 1997) (20 CONN. L. RPTR. 33); Lehigh Petroleum Supply Inc. v.Norwich Board of Tax Review, judicial district of New London at Norwich, Docket No. 093057 (November 18, 1991) (5 CONN. L. RPTR. 270).
The word "just" in the federal and state taking clauses invokes concepts of fairness and equity, and no rigid rule has ever been fashioned by federal or state courts for determining what "just compensation" within the meaning of those constitutional provisions is under all circumstances and in all cases, but "the dominant consideration always remains the same: What compensation is `just' both to an owner whose property is taken and to the public that must pay the bill?" United States v.Commodities Trading Corp., 339 U.S. 121, 123-24 (1950). The function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken and "[o]rdinarily, although not necessarily, this is the market value of the property taken [and] the question of what is just compensation is an equitable one rather than a strictly legal or technical one." Colaluca v. Ives,150 Conn. 521, 530 (1963).
There are certain undisputed facts that are unique to this case which invoke considerations of fairness and equity other than those involved in the cases that have been cited, and that are relevant to the court's determination of the question of whether the amount of compensation that is "just" under the particular circumstances of this case is an award that makes no offset by reason of the contamination of the subject property. Apart from the fact that the defendant could not be subject to liability for reimbursement in a state cost recovery action for the reasons stated in this opinion which are similar to the court's finding in Murphy, these distinctive circumstances include, first, the opinion of the plaintiffs' appraiser that the property has no value rather than a quantifiable diminished value, second, the fact that ATC was actively involved with the town and NCEA for a number of years before the taking in comprehensive and detailed plans for the development of the property and in cooperative efforts to obtain state and federal funding for that purpose, including environmental remediation, and third, the post-condemnation transfer of the property to a private non-governmental corporation, Windham Mills, who is not a party to this action, and cannot have party status in this case CT Page 4431 because "the condemnor litigates solely against the actual condemnee(s) who may have to litigate separately against PRPs not named in the eminent domain action." 7A Nichols, supra, p. 13B-91, 92.
The argument implicit in the plaintiffs' claim that ATC is entitled to no compensation whatsoever for the taking of its property, rather than a quantifiable diminution in value as was claimed by the condemning authority in Finkelstein, is that "just compensation" may be fairly and equitably determined under the facts of this case solely on the basis of their appraiser's perception of the magnitude of the difference between the "clean" value of the property and the estimated costs of the ongoing remediation being performed by Windham Mills, presumably at its own expense, as implied in the town's offer of proof. In advancing that argument they recognize no distinction in terms of fairness and equity between offsets that merely diminish value, as in Murphy, and those that completely extinguish value, and fail to recognize that "[e]minent domain and environmental law are distinct legal fields with different goals", because the controlling principle in eminent domain is just compensation, while the purpose of environmental law is the enforcement of liability for remediation expenses against those responsible for the illegal condition, without regard to equitableconsiderations. (Emphasis added.) 7A Nichols, supra, § 13B.03[2][b].
The imposition of the costs of abating pollution upon an innocent landowner in connection with the administration and enforcement of this state's environmental laws, where such costs "may be in excess of the value of the land . . . appears to be a draconian result that violates notions of fairness [and we] also recognize that there may be others who, without fault of their own, find themselves the owners of polluted real estate without their having created or caused the contamination [but the legislature's] concern for the public welfare outweighed any sympathy for individual property owners." Starr v. Commissionerof Environmental Protection, 226 Conn. 358 at 398 (1993). Justice Berdon, in his dissent in that case, stated that "[t]his case boils down to the simple issue of fairness [which] is whether theinnocent landowner should be financially liable for the enormous cost of remediation, which is likely to amount to sums over and above the value of her property [and] I do not believe that the legislature intended such a harsh result." (Emphasis in original.) Id. 398-99. CT Page 4432
The second distinctive, if not unique, factual aspect of this case is that ATC was actively involved with the town and NCEA for a number of years before the taking in a non-adversarial and cooperative effort to obtain governmental funding for the rehabilitation and redevelopment of the property pursuant to the Economic Development and Assistance Act of 1990, General Statutes § 32-220 et seq., which culminated in the publication and submission to the department of economic and community development of a lengthy, comprehensive and detailed economic development plan entitled "Windham Mills and Windham Stale Heritage Park Master Action Plan" (Master Plan) in December, 1993. The Master Plan made reference to the Act as "[o]ne of the likely sources" of funding (page 22), and also stated that "[t]he Economic Development Administration of the U.S. Department of Commerce has indicated an interest in contributing financially to this project, if a wholly public aspect can be identified and it meets the `public interest' test." Id. 74.
The first selectman of the town of Windham, Walter Pawelkiewicz, in an affidavit filed in this court in connection with a related matter on May 18, 1994, acknowledged that "[t]own officials attempted to work with the property owners on areas of apparent mutual interest [and the] property owners sought state assistance to bring the property to a market ready condition." He also stated that "new jobs and tax paying entities [were sought by the town] for the site [and that the] initial cooperation resulted in the [state bonding commission] awarding a $130,000 grant for a structural, economic and environmental feasibility analysis and master plan of redevelopment [and as] a result of this work, the [state bonding commission] awarded the project an additional $3 million in regional economic development bonding funds for the environmental remediation and rehabilitation of the first 100,000 sq. ft. of space in a 5 year phase-in plan."
The first selectman testified at the trial that at least as of December 11, 1997, the date that he was called as a rebuttal witness, the town had not received the 1993 grant of three million dollars. In any event, Amadon acknowledged in the course of his testimony that he had reviewed the Master Plan and was aware of the references in that document to the availability of state and/or federal funding, but that those potential sources of reimbursement for remediation costs had not been investigated or mentioned in his report and had not been utilized by him in any way in forming his opinion that the cost estimate that he had CT Page 4433 received could be appropriately deducted from the initial value that he had put on the subject property.
The mutual interests of the town and ATC in the successful development of the property are outlined in a memorandum dated November 3, 1992, from Jacob Pinson, an ATC partner, to the first selectman, Pawelkiewicz, which states that "[r]emaking the complex into a 21st century regional job creation center will require a unique partnership [based] on trust and shared goals." Pinson testified i that the subjects of their "friendly" discussions thereafter included the environmental concerns and costs necessarily involved in the project and the possibility of a joint venture in which ATC would be a limited partner and the town or some other entity would be the general partner, but that the possibility of a taking of the property by eminent domain did not enter into their discussions or become a subject of adversarial negotiation until May of 1994.
The third and most significant factual distinction in this case that makes it truly sui generis, is the post-condemnation transfer of the subject property to Windham Mills, a private, non-governmental corporation, who is not a party to this proceeding, although just prior to the commencement of trial, counsel for NCEA identified herself as counsel for Windham Mills as well. By virtue of the filing of a form III certification as the transferee of the property, it assumed the responsibility for remediation as between the town and itself, thereby exposing ATC to a cost recovery action in the future, depending upon the nature of any indemnification agreement that may have been made between them, and whether or not any state or federal funding that may become available in the course of the contemplated five year development of the site will be utilized for the payment of the full costs of environmental remediation.
Market transactions involving contaminated property nearly always involve some indemnity between buyer and seller for contamination risks and costs but where a condemning authority compels sale by eminent domain it cannot directly compel indemnity by the condemnee; 7A Nichols, supra, p. 13B-130; particularly because "just compensation" is based on the principle of indemnity which requires that the owner be put in as good a position pecuniarily as if his property had not been taken. United States v. 564.54 Acres of Land, 441 U.S. 506,511-12 (1979). Accordingly, an eminent domain valuation trial should not be used as a vehicle for compelling indemnity to the CT Page 4434 condemnor or to a third party, for that matter, as part of the condemnation process. See McMurry Pierce, "Environmental Contamination and its Effect on Eminent Domain," A.L.I.-A.B.A. 133, 169 (1993).
For all the foregoing reasons, the defendant's motion in limine is granted.
HAMMER, J.T.R.