[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This dispute between the plaintiffs, W.R. Associates of Norwalk, et al (the Associates), and the defendant, the Commissioner of Transportation for the State of Connecticut, arises from the State's condemnation of the Associates' property to construct a highway. The case has spawned extensive litigation.
On February 6, 1984, the State filed a certificate of taking for a portion of the Associates' property. The taking was a federal urban systems improvement project with the State, pursuant to an agreement with the City dated July 19, 1977, acting on behalf of the City of Norwalk. Prior to the condemnation, the Associates owned 176,139.21 square feet (4.0436 acres) of land on which they operated their chemical mixing plant and tank farm (Guard All Chemical Co.) in addition to a right of way over another 19,584.65 square feet (0.4558 acre). The State condemned approximately 30,492 square feet (0.7 acre) of the Associates' property and the right of way.[1]
After the taking, the Associates were left with 145,647.21 square feet (3.3436 acres) of land. The State determined the value of the property taken including the right of way to be $104,000, which it deposited with the court. The Associates instituted this action challenging the sufficiency of the award and seeking other relief. The Associates also instituted a separate injunctive action to insure access to their property during construction of the highway in the Stamford/Norwalk judicial district. A stipulation was entered in the injunctive action on July 9, 1984, which required the State to make certain modifications and to file an amended taking. CT Page 7834
During the course of construction of the highway in 1984-85, the State's contractor excavated, among other debris, barrels containing quantities of environmentally sensitive chemicals. As a result, the Department of Environmental Protection of the State of Connecticut (DEP) instituted suit against the Associates in the judicial district of Hartford/New Britain on or about December 12, 1985 for reimbursement for DEP's expenses in removing and disposing of the barrels. Pursuant to a stipulated judgment, the Associates agreed to repay the State $110,676.48, the amount allegedly incurred by the State to remove and dispose of the barrels, together with interest.
During construction of the highway in 1984 to 1986, the State constructed a curb cut at the edge of the former right of way and Duke Place. The parties agreed that the State would complete that work in approximately three weeks. The State entered the property to do the construction, but ultimately halted its work because of environmental concerns and never completed the curb cut.
The trial of the present action commenced August 23, 1988 before a predecessor panel. The Associates asserted at trial that the right of way that was taken by the State should be returned to the Associates because the right of way was unnecessary for the taking. The panel indicated it would bifurcate the issues and first determine whether the panel had jurisdiction to consider whether the taking of the right of way was necessary. If it determined that it had such jurisdiction, it would go on to decide whether the right of way should be returned to the Associates. On October 6, 1988, the State filed an amended certificate of taking, as required by the July 9, 1984 stipulation.
On December 28, 1988, the panel hearing the case decided that it had jurisdiction in this action to entertain the Associates' request for a return of the right of way and a determination whether the right of way was necessary to the taking.[2] On August 9, 1989, a successor panel of judges decided that the State had substantiated the public necessity for the taking of the right of way based on the State's claim that it was necessary for lateral support of the highway.[3] The Associates later filed a notice of intention to appeal the August 9, 1989 decision that the taking was necessary.
As part of the July 9, 1984 stipulated judgment, the State CT Page 7835 was to install a Jersey barrier, fencing and two gates on the Associates' property line. Although. the entire highway project had been completed, the State never completed the installation of the Jersey barrier, fencing and gates. The Associates eventually completed the work. As a result of defendant's re-entry but failure to complete, the Associates sought mandamus relief on or about February 14, 1990. Thereafter, the State and the DEP entered into a consent order regarding remediation and monitoring on the Associates' remaining property.
 I
The plaintiffs moved in limine to preclude the panel from considering the State's environmental concerns regarding the question of just compensation.
While there is no Connecticut appellate case directly addressing whether evidence of contamination should be considered in a valuation proceeding, two superior courts considering the issue have rejected contamination evidence. In Murphy v. Town ofWaterford, Superior Court, Judicial District of New London, Docket No. 520173 (July 9, 1992, A. Healey, S.T.R.), the town argued that environmental contamination discovered on the property after the date of taking should be considered in arriving at the amount of just compensation. The court concluded that "because the Connecticut Statutory scheme provides for reimbursement of cleanup expenses, the defendant town cannot require the reduction, in this particular proceeding, of the amount determined to constitute just compensation for this taking." Id. Further, the court stated that "even recognizing that the matter of just compensation is not strictly legal but equitable, the circumstances just set out definitely militate against permitting, if it could ever be the case, reducing the just compensation constitutionally due this plaintiff in this particular proceeding." Id. Among other things, the court noted that the town had not shown that the plaintiff was negligent and caused the contamination. Id.
Even if the property owner is liable for the contamination, the cleanup costs should not be a factor in determining just compensation. If cleanup costs were factored into the amount of compensation, the condemnor would benefit from double recovery. The owner would in effect pay for the cost of cleanup by receiving less money for the condemned property and pay again as a result of any judgment against him. The equitable nature of the CT Page 7836 condemnation proceeding precludes a double payment.
The court in Northeast Economic Alliance, Inc. v. ATCPartnership, Superior Court, Judicial District of Windham at Putnam, Docket No. 049248 (June 22, 1998, Hammer, J.T.R.) (21 Conn. L. Rptr. 635), also considered the issue. The court granted the motion in limine filed by the defendant to preclude evidence of environmental contamination or cost estimates for remediation. The court relied on the following: (1) under Connecticut case law, property itself is valued in an eminent domain action, not the in personam liability of an owner; id., 637; (2) if the owner is liable for contamination, costs of cleanup can be recovered in a proceeding which provides fuller safeguards for due process; id., 638; (3) in an eminent domain proceeding, the trier relies on opinions of valuation experts rather than experts on environmental contamination; id., 639; (4) there are practical difficulties with quantifying contamination; id.; (5) considering environmental contamination would not further judicial economy; id.; and (6) there were fact-specific deficiencies in the evidence.[4] Id.
Based on the reasoning of Murphy v. Town of Waterford, supra,[5]
Superior Court, and [Northeast Economic Alliance, Ind. V. ATCPartnership, supra, the cost of cleaning up the contaminated property should not be considered here. See also Aladdin, Inc. v.Black Hawk County, 562 N.W.2d 608, 615, 616 (Iowa 1997) (considering cleanup costs would violate due process rights of property owner to have his liability established in separate proceeding; policy considerations also weigh against considering evidence); Department of Transportation v. Parr, 633 N.E.2d 19,22 (Ill.App. 3 Dist. 1994) (remediation costs do not constitute a condition on the property; even if admissible under statutes, admission would violate procedural due process rights of owner).
While there are some cases to the contrary m a few states, the better reasoned cases exclude contamination evidence, and leading commentators appear to agree.
Additional support for refusing to consider evidence of contamination in valuation proceedings is found in Nichols onEminent Domain, often cited by Connecticut court decisions. The authors conclude that evidence of contamination should not be admitted over objection in eminent domain valuation trials. 7 AP. Nichols, Eminent Domain (May 1998) § 13B.03, pp. 13B-86 — 13B-87. Supporting reasons for this position include: (1) CT Page 7837 an eminent domain valuation trial is in rem, not in personam; id., 13B-89; (2) eminent domain is independent of environmental law; id., 13B-90; (3) due process supports exclusion; id., 13B-92; (4) the burden of proof and entitlement to jury trial differ in eminent domain and environmental trials; id., 13B-97, 13B-99; (5) exclusive federal jurisdiction exists for some environmental laws; id., 13B-100; (6) the risk of double liability; id., 13B-101; and (7) the project influence rule;[6] id., 13B-104:
 "The exclusion of contamination evidence from eminent domain valuation trials is justified on several grounds. Eminent domain is a proceeding in rem whereas [environmental] actions are [in personam. . . . The differing burdens of proof, the different entitlement to jury trial, and other procedural distinctions justify separate proceedings. . . . such evidence should not be admitted over objection. . . . `Market Value' is not a tail that wags the dog; rather `Just Compensation' is the dominating and only principle . . . Fair Market Value is the test only if such a standard would be `Just' and if there is indeed a `Market'. If, however, the property is definitionally nonmarketable . . . in that the "highest and best use' of contaminated property is not to sell it but to keep it devoted to its existing use, then clearly its value in the actual market has no bearing on the just compensation payable under . . . eminent domain. In short, the only just disposition is to exclude this evidence . . . . [E]xcluding evidence of contamination is superior to admitting such evidence. . . . it is necessary to exclude this evidence because the proper province for resolving all questions of contamination is not an eminent domain valuation trial but rather a separate environmental action." 7A Nichols on Eminent Domain, § 13B.03, pp. 13B-87-88.
Nichols, also decries the risk of double liability:
 "If the curt allows evidence of contamination in an eminent domain case, it might inadvertently impose double liability because the owner might face the same liability again in a subsequent environmental case. The owner would receive less than fair market value, disregarding cleanup costs. Then subsequently, the owner would confront liability for cleanup costs again. . . . It is submitted that this may jeopardize due process, CT Page 7838 equal protection, and just compensation." 7A Nichols, pp. 13B-101-103, and footnotes therein.
Nichols also observes that: "In determining just compensation, the courts tend to admit any factor bearing upon market value. Yet, the fact that evidence is `relevant' does not itself justify its admission. Further, the fact that evidence of contamination may influence `value in the actual market' does not necessarily justify its admission in determining `fair market value' within the `hypothetical market' contemplated for purposes of `just compensation.' Eminent domain law is replete with situations in which `relevant' evidence bearing upon market value is properly excluded. The submission here is that contamination is another such situation." 7A Nichols, § 13B.03[3][a], pp. 13B-107-108.
Nichols concludes that "evidence of contamination should be excluded. All questions relating to contamination should be resolved not within the eminent domain valuation trial but in a separate action under environmental legislation and/or an appropriate common law action." 7A Nichols, § 13B.03[4], pp. 13B-121.
The double liability argument is especially persuasive under the facts here. If the court allows evidence of contamination, it might inadvertently impose double liability because the owner can face the same liability again in a subsequent case. This can subvert due process, equal protection, and just compensation. The panel is sensitive to the equitable underpinnings of condemnation law. See, Slavitt v. Ives, 163 Conn. 198, 209, 303 A.2d 13
(1972). Because the condemnor will receive payment from the plaintiffs toward the cost of cleanup by enforcing its judgment in the environmental action, it would being equitable to deduct the cost of cleanup from the just compensation due the plaintiffs.
The panel therefore determined that it will not consider evidence of contamination in determining the amount of just compensation.
 II
There is a huge difference between the plaintiffs' appraisal based on income capitalization, and that of the State based on comparable sales. The plaintiffs' original estimate of damages CT Page 7839 was $1,938,000.00. A supplemental report revised this to suggest a figure of $1,735,300.00 and even $1,635,000.00 if the right of way "were to be returned." The State's estimate of damages is $33,900.00, far less than the $104,000.00 the State deposited with the Superior Court, which represented its estimate of damages at time of taking. This discrepancy was not explained to the panel's satisfaction. The panel is, to say the least, gravely concerned with a spread of this magnitude, with the methodology employed by the plaintiffs and with the variation between the initial deposit and subsequent valuation by the State. The existence of such a wide discrepancy between fair market valuations calls for scrutiny as to the method by which those valuations were ascertained. Burritt Mutual Savings Bank v. NewBritain, 20 Conn. Sup. 476, 483, 140 A.2d 324 (1958), rev'd on other grounds, 146 Conn. 669, 154 A.2d 608 (1959).
 The before and after rule is the proper method to determine the value of property that is partially taken.
"When only a portion of a party's property is taken, the landowner is entitled not only to compensation for the value of the property taken, but also to severance damages for the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes." Alemanyv. Commissioner of Transportation, 215 Conn. 437, 444,576 A.2d 503 (1990). "Damages recoverable for a partial taking are ordinarily measured by determining" the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter' . . ." Cappiellov. Commissioner of Transportation, 203 Conn. 675, 679,525 A.2d 1348 (1987).
 A The capitalization of income approach is not appropriate forpartial takings.
"The capitalization of income approach is used to value income-producing property when it is completely taken." (Internal quotation marks omitted.) State ex rel. Highway TransportationComm'n v. Edelen, 872 S.W.2d 551, 557 (Mo.Ct.App. 1994). Use of the income method "in a case of a partial taking is improper."State ex rel. Highway Transpotation Comm'n v. Kuhlmann,830 S.W.2d 569, 571 (Mo.Ct.App. 1992); see to the same effect,Humble Oil Refining Co. v. State, 15 App.Div.2d 686, 223 CT Page 7840 N.Y.S.2d 448 (1962); affd, 12 N.Y.2d 861, 187 N.E.2d 791,237 N.Y.S.2d 338 (1962) (Where partial taking, little or no basis for use of income capitalization method); 29A C.J.S., Eminent Domain, § 156 (1996). The capitalization approach is not the proper method where only land and improvements are taken and the business is continued. State v. Lewis, 142 So.2d 652, 656
(La.Ct.App. 1962).
We are not dealing here with income producing farm land or with mining property. "Income cannot be capitalized to produce a residual value where the appropriated land is neither producing income nor equipped to do so." (Internal quotation marks omitted.) Lucre Corp. v. County of Gibson, 657 N.E.2d 150, 153
(Ind.Ct.App. 1995), cert. denied, ___ U.S. ___ 117 S.Ct. 362,136 L.Ed.2d 253 (1996); [J.J. Newberry Co. v. City of EastChicago, 441 N.E.2d 39, 42 (Ind.Ct.App. 1982); see Levitinv. State, 12 App. Div. 2d 611, [13 App.Div.2d 611], 214 N.Y.S.2d 712 (1961).
In the well-recognized text, Orgel, Valuation under Eminent Domain (2d Ed. 1953) (cited with approval by the Connecticut Supreme Court), Orgel suggests that the comparative sales method is often a more accurate method of valuation than capitalization, even when the entire business is evaluated. When there is a partial taking, however, the value of the entire enterprise may have only a remote bearing on the value of the appropriated property. Id., 1 Orgel, supra, § 158-59. Obviously, in the absence of special circumstances, the smaller the piece of property taken, the less relevant the capitalization method.
The Connecticut Supreme Court has recognized the dangers of linking land value to business profits:
 "It is generally recognized that neither the past nor estimated future profits of a business are reliable evidence of the value of the land on which the business is located because business profits depend on so many factors that their effect on the market value of the real estate is too remote. 1 Orgel, Value under Eminent Domain (2d Ed.) § 12.3 121[1], [2]." [Eljay Realty Co. v. Argraves, 149 Conn. 203, 207, 177 A.2d 677.
See also, Laurel, Inc. v. Commissioner of Transportation,180 Conn. 11, 38, 428 A.2d 789 (1980), which points out that "it is the land which is to be appropriated, not the business." Id. at 39. CT Page 7841
Another treatise warns of the need to insure against introduction of an improper distortion in income capitalization analysis, because of disproportionate values being assigned to land and buildings. 29A Corpus Juris Secundum, Eminent Domain, § 156. It is noteworthy that the piece of land taken in the present case was approximately one-sixth to one-seventh of the total property in which the owner had a fee interest. It is also important that income increased after the taking according to the landowner's own appraiser's chart of annual income. The value of the entire business appears to have little or no relevance to the value of the taken property, which overall, represents a small percentage (17%) of the total property.
The court in J.J. Newberry Co. held that the use of the capitalization of income approach requires that the property taken is itself capable of producing the income capitalized. That court relied on New York law which stated that a vacant, basically unimproved parcel of land was not conducive to the capitalization method, since it was the ongoing business, not the parcel, which enhanced the value of the land. See In re RockawayPoint Blvd., Queens County, 28 N.Y.2d 465, 271 N.E.2d 546,322 N.Y.S.2d 708 (1971). The J.J. Newberry Co. court held that capitalization "was too speculative, regardless of the fact that Newberry had at one time operated a business on the property . . ."J.J. Newberry Co. v. City of East Chicago, supra, 441 N.E.2d 42-43.
While there appear to be no Connecticut cases which have passed directly upon this issue, the better reasoned cases, especially those from New York, persuade this panel that under the facts of this case, the capitalization of income approach to valuation should not have been used for this partial taking.
 B When used, the capitalization of income approach must be utilized consistently before and after the taking.
In Mil-Pine Plaza, Inc. v. State, 72 App.Div.2d 460,424 N.Y.S.2d 937 (1980), the court of our sister state, New York, held that in those cases that the measure of damages for a partial taking is the difference between the property's value before condemnation and the value of the remainder afterward, "both the `before' and "after' valuations must be calculated byCT Page 7842the same method." (Emphasis added.) Id., 939 (citing Diocese ofBuffalo v. State, 24 N.Y.2d 320, 248 N.E.2d 155, 158 (1969)). TheMil-Pine Plaza court further held that where the claimant utilized an unrecognized formula in its valuation, the formula was explicitly rejected. Finally, that court held that the reduction in income based upon loss of parking spaces was unacceptable where income of a similar parcel of property actually increased despite the loss. Mil-Pine Plaza, Inc., supra,72 App.Div.2d 461.
Moreover, the rate of capitalization should be a reflection of the market rate, and "the same capitalization rate should be used to determine the value of the property after the taking as was used to determine its value before the taking." 29A C.J.S., Eminent Domain, § 156, p. 386. The plaintiffs' expert did not use the same method for the "after" valuation as he did for the "before" valuation. In fact, he did not use income valuation at all for the "after" valuation. Instead, he took the "before" valuation and made some arbitrary and inadequately explained deductions. The result is that he failed to calculate a proper ""after" valuation.
Virtually all authorities advise that extreme caution be used in the application of the capitalization method. Proper use of the method depends largely on the experience and the judgment of the appraiser in considering every element that enters into the final result. A small variation in any of those items considered can produce large variations in the ultimate conclusion. Citino.V. City of Hartford, Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 512206 (April 25, 1994, Bieluch, J.).
Even where the capitalization of income method has been approved, courts have cautioned it should be carefully scrutinized and based on a foundation which minimizes, to the extent possible, conjecture and uncertainty. See, e.g., State v.Bare, 377 P.2d 357 (Mont. 1962). "Although the income approach is an accepted method of appraisal, in assessing the value of property on the basis of income, care must be taken to distinguish between income from the property and income from the business conducted on the property." (Internal quotation marks omitted.) Department of Transportation v. Fleming,436 S.E.2d 407, 409 (N.C.Ct.App. 1993).
Moreover, the trier is not limited to using one method of CT Page 7843 property valuation. See, e.g. Cosgrove v. Hartford, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 561077 (February 27, 1998, Aronson, J.T.R.).
Compensation depends on what a ready and willing buyer would pay for the business. It is not likely that a ready and willing buyer would be able to pay significantly less for a business after a taking like this than before the taking, when the income of the business increased after the taking. See 1 Orgel, supra, § 158-59.
 C
The plaintiffs' appraiser set forth a "NET INCOME CHART" with regard to his income capitalization approach. It lists, among other things, gross sales and net profit of the business yearly from 1979 through 1984, purportedly in thousands of dollars. The F taking was on February 6, 1984. Therefore the great majority of 1984 income represents income earned after the taking (almost 11/12 of the year). All the rest (five years) is before the taking. Since later records must be available (from company records or based upon tax returns), we would have expected more balance in view of five years of pretaking income, for a computation that must reflect "before" and "after" measurements. No explanation was given for the failure to rely on more "after" years to get a fair balance.
While we have not ignored the remainder of the chart, some of the figures are interesting. Gross sales for 1984 exceed those for 1982 and 1983. Gross profit for 1984 exceeds that for 1982 and 1983. Net profit for 1984 exceeds that for 1982 and 1983. "Net After Manager" for 1984 exceeds that for 1982 and 1983. The appraiser attempts to explain that 1982 and 1983 saw a drop in "oil" prices. Nevertheless, it is clear that after the February 6, 1984 taking, the company earned considerably more for that year than it had in 1983 and more than in 1982. It is reasonable to assume that this explains why the plaintiffs' appraiser failed to make another income capitalization analysis "after" the taking and why he did not follow the requirements of consistency of method in the "before" and "after" valuations set forth inMil-Pine Plaza, Inc. v. State, supra. That would have shown that the plaintiffs were in a better position "after" than "before," and therefore suffered no damages. It is also a reasonable inference that the appraisal did not consider the years after 1985 because those figures would have produced CT Page 7844 numbers which were adverse to the plaintiffs' case.
The appraiser used the following valuations:
value before taking $5,952,000
value after taking $4,014,000
difference $1,938,000
If, for the sake of argument, we assume the correctness of those figures, the appraisal clearly sets forth that about one third of the value of the plaintiffs' total property was taken by the State. Yet, the amount of property actually taken was only about 17% of the total property. The land taken was not in and of itself income producing, as that term is understood. Moreover, the business continued with increased success without the condemned land. It would be unreasonable to suggest under these circumstances that a buyer could have purchased a six million dollar business for about four million dollars after a loss of only 17% of non-income producing land, in the face of the business "income increasing after the taking.
Clearly, it could not happen.
Moreover, the appraiser's oft repeated statement that "what the property earns is what the property is worth" is a double edged sword. Since the property increased its earnings after the taking — in effect, had increased success without the condemned land — that condemned land could not be very valuable, under the plaintiffs' own analysis.
One of the underpinnings of the plaintiffs' appraiser's analysis was that there were no other chemical companies in Connecticut "that [have] a chemical storage tank farm." This panel is not foreclosed from using its own knowledge, as our supreme court has reminded us; Laurel, Inc. v. Commissioner ofTransportation, 180 Conn. 11, 37-38, 428 A.2d 789. In a heavily industrialized state like Connecticut it is common knowledge that toxic materials are stored and dispensed every day. While we assume that the facilities that do this are not exactly the same as Guard All, it is. not unreasonable to conclude that some are sufficiently similar for reasonable comparison purposes, with percentage additions and subtractions to account for differences. All things considered, we cannot conclude that this property is CT Page 7845 so unique that it precludes use of the comparable sales approach.
Therefore, this panel finds that the comparative sales approach could have been used. "The trier may select the most appropriate [method of valuation] to the case before him in arriving at his own conclusion as to the value of the land interest." Laurel, Inc. v. Commissioner of Transportation, Id. The trier "may weigh the opinions of the appraisers, the claims of the parties in light of all the circumstances in evidence which bear on value, and his own general knowledge of the elements that pertain to value." Id. And "the visual observations made by the trier on a visit to the property are as much evidence as the evidence presented . . . by the witnesses under oath."Houston v. Highway Commissioner, 152 Conn. 557, 558,210 A.2d 176; Gentile v. Ives, 159 Conn. 443, 452, 220 A.2d 680 (1970).
 II
Moreover, the complex fiscal calculations presented to the court by the plaintiffs' appraiser involve a complicated, unfamiliar and unrecognized methodology that this court is not prepared to accept without a good deal more explanation than was given. It involves an arbitrary capitalization rate — used only once, not twice as required — chosen without any real regard to economic circumstances. "The rate of capitalization . . . ultimately selected for use by the appraiser cannot be the result of an arbitrary judgment on his part; rather it is a reflection of the current, well informed, conservative public judgment or rating as expressed in comparable investment transactions and long term investments having characteristics similar to those found in the property under appraisal." Kniskern, Real EstateAppraisal Valuation, p. 399. The rate must reflect the market, and must, if used, be carefully applied both before and after the taking. There is a lack of evidence in this regard. Furthermore, under the facts of this case, the panel believes that income capitalization brought about an inflated view. It should not have been used in a partial taking under the facts of this case, especially in the manner in which it was used.[7]
While the defendant's appraiser's report and opinion do not suffer from the same maladies as that of the plaintiffs, we find his conclusion set forth to be, like the plaintiffs', too result driven.[8] The State never satisfactorily explained to the panel why it deposited $104,000.00 in court-obviously its view of damages at the time of the taking — and later claims damages of CT Page 7846 $33,900.00.
The trier may accept or reject expert testimony in whole or in part "and may give constructions to the evidence which are at variance with the claims advanced by the parties;" Toffolon v.Avon, 173 Conn. 525, 530, 378 A.2d 580 (1977); Gentile v. Ives,159 Conn. 443, 451, 270 A.2d 680 (1970). "The referees [are] free to consider comparable sales of land and to determine independently the fair market value." South Farms AssociatesLimited Partnership v. Burns, 35 Conn. App. 9, 17, 644 A.2d 940
(1994); Robinson v. Westport, 222 Conn. 402, 410, 610 A.2d 611
(1992).
Therefore, we are left with the facts set forth by both sides, our view of the property and our own knowledge of the value of condemned land.
 III
The panel does not agree with some of the plaintiffs' claims regarding damages.
Adequate damages do not include exemplary damages which are punitive and have nothing to do with compensation for loss of property. 26 American Jurisprudence 2d, Eminent Domain, § 367. Furthermore, we do not believe punitive damages are merited.
Damages for an easement provide another problem. If an easement is taken, when the "before and after" formula is used, damages are determined by the decrease in the value of the whole estate. Redevelopment Agency v. Tobriner, 153 Cal.App.3d 367. Connecticut cases are in accord. "When an easement. appurtenant to land is taken, the measure of damages is the depreciation in the value of the dominant tenement. . . . This is shown by the difference in the fair market value of the property before and after the taking. . . . Such depreciation is the full measure of [the] damages [the condemnee] is however, entitled to the actual depreciation in the value of [the] property suffered by reason of the fact that these . . . easements are no longer appurtenant thereto." Stamford v. Vuono, 108 Conn. 359, 369-370, 143 A. 245
(1928).
"Where part of a parcel of land or an easement is taken by eminent domain, the general rule is that the damages are the difference between the market value of the whole tract as it was CT Page 7847 before the taking and its market value after the taking."Northeastern Gas Transmission Co. v. Tersana Acres, 144 Conn. 509134 A.2d 253 (1957). See also, N.Y., N.H. H.R. Co. v. NewHaven, 81 Conn. 581, 583 71 A. 780 (1909).
Clearly, the plaintiffs' appraiser's arbitrary selection of an additional figure for the right of way resulted in an improper measurement of that easement. Since our Supreme Court instructs that an easement's value is included in the difference between the "before and after" values of the property, in effect the approach used could allow the plaintiffs to collect twice for its easement.
The plaintiffs also claim damages because the property has become more nonconforming than before. They allege that the partial taking caused a setback violation to their property which was already nonconforming and urge damages under Section 48 24. Pursuant to Section 48-24, Conn. General Statutes, the condemnor of a partial taking shall, if the remaining portion does not conform to area requirements of zoning regulations, obtain a variance for the remaining property before condemning the property. The statute further provides that if the condemnor fails to do so, the owner shall be reimbursed for the total amount of the property, and the condemnor shall take title to the entire property. The Commissioner did not secure a zoning variance and the plaintiffs claim that they are entitled to damages for that reason.
The plaintiffs' brief indicates (almost parenthetically) a pro forma "willingness" to grant a deed of the entire parcel at their appraiser's figure of close to six million dollars. Although the statute is mentioned generally in its claims for relief, this is the first time the plaintiffs made specific mention of a total taking. The plaintiffs have never insisted or demanded that the state acquire the total of the property for itsactual current value. See Tolland Enterprises v. Commissioner ofTransportation, Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 508172, April 28, 1993, D. Shea, J.T.R. (Where plaintiff never previously demanded a total taking, state not required to do so under Sec. 48-24). In fact, the plaintiffs argue that they should be awarded damages for the furtherance of the nonconformity.
The short answer is provided by Laurel, Inc. v. State ofConn., 169 Conn. 195, 206-7, 362 A.2d 1383 (1975), which concerns CT Page 7848 a similar failure of the defendant to file for a variance for a setback violation, among other violations. Our Supreme Court, referring to Sec. 48-24, held: "In view of its history and the wording of the statute, `if the remaining portion of such property does not conform to the area requirements,' it is evident that what is intended and required is a lot area variance for a substandard parcel, that is, for what will remain of the whole tract after a partial taking. Under the facts of this case, there was no duty upon the defendants to seek any variance under General Statutes § 48-24." Laurel, Inc. v. State of Conn., Id. Like the circumstances in Laurel, a setback violation does not trigger the statute, only an area violation. In view of the holding in Laurel and the panel's reservations about the plaintiffs' appraisal, the plaintiffs' offer must fail.
However, the panel can properly consider a variance or nonconformity as a factor affecting the market value of the plaintiffs' remaining land. Smith v. Zoning Board of Appeals,174 Conn. 323, 329, 387 A.2d 542 (1978); Talarico v. Conkling,168 Conn. 194, 197, 362 A.2d 862. In Tolland Enterprisesv. Commissioner of Transportation, supra, the court held that despite a failure to seek a variance, in a case where the plaintiff did not insist that its property be fully acquired under § 48-24, Conn. General Statutes, the nonconformity from a partial taking could none the less affect the value of the land. The court cited Smith v. Zoning Board of Appeals, Id. at 328, which held: "Surely there is a clear case of uncommon hardship beyond the control of a property owner when the state seeks to condemn a portion of his . . . land and thereby renders it nonconforming to a minimum lot area restriction. . . . We conclude that exceptional difficulty or unusual hardship was implicit in the proposed taking." Id. The Tolland court therefore concluded that "the probability of a variance to cure the adverse consequences of the nonconformity . . . is so great that a prospective purchaser would diminish the price offered . . . only by his estimate of the expenses to be incurred in obtaining the variance. These costs would be for legal and engineering services. Although no evidence was presented on these items, the court is sufficiently familiar with the work to conclude that a reasonable allowance for those services would be $10,000.00. It is appropriate that the state should bear these expenses in view of the failure of the commissioner to follow the mandate of General Statutes § 48 24 . . ." Tolland Enterprises v.Commissioner of Transportation, supra. CT Page 7849
The panel is persuaded by the logic of Tolland. The probability of a variance is so great that damages are limited to the cost of obtaining that variance. Like the ruling in Tolland, the panel is sufficiently familiar with the work involved to conclude that a reasonable allowance for those expenses would be $10,000.00, and finds it appropriate that the state bear that expense. This solution places the plaintiffs back into the position they were in prior to the taking.[9] Under the circumstances presented, the panel declines to award additional damages for this issue.
The plaintiffs also claim they may wish to enlarge their plant. The proper test of severance damages is not the cost of future remedial action, but the present impairment of value;Alemany v. Commissioner of Transportation, 215 Conn. 437, 448,576 A.2d 503 (1990); although such evidence may be considered as it bears on present value. Andrews v. Cox, 127 Conn. 455, 460, 17A.2d 507 (1941); Gaylord v. Bridgeport, 90 Conn. 235, 240, 96A 936 (1916).
Moreover, it is not reasonably likely that there could be any zoning approval for future development of the property in question because of the presence of underground pollution. Securing zoning approval in the face of the contamination found in the area is not a probability this panel can adopt. Accordingly, other than as stated, the panel rejects the plaintiffs' argument regarding additional damages for zoning problems.
Finally, throughout the trial, the plaintiffs complained that the direct access provided by the state was inferior to the somewhat circuitous right of way they previously used and that it caused safety problems and parking problems for trucks using their facilities. Apparently, it was possible previously to park waiting trucks on the right of way, a difficulty now in view of the reduced space arrangement. While the panel is sympathetic to the problems of parking large trucks, our task is to resolve problems in terms of dollars, and we are well aware that there is considerable case law that direct highway access may increase the value of property as far as a prospective buyer is concerned. See, Hall v. Commonwealth, 235 Mass. 1, 126 N.E. 49, 50 (1920);Kirkendall v. City of Omaha, 39 Neb. 1, 57 N.W. 752, 754; Statev. Smith, 143 N.E.2d 666, 669 (Ind. 1957); Tandet v. UrbanRedevelopment Commission, 179 Conn. 293, 308, 426 A.2d 280
(1979); Lefebvre v. Cox, 129 Conn. 262, 265, 28 A.2d 5 (1942). CT Page 7850
The plaintiffs needed access that was adequate to the maintenance and furtherance of their commercial business. "The condemnor must leave an owner . . . with reasonable access to the highway for [its] purposes where [it] had access immediately prior to the condemnation. However, . . . [it] is not entitled to damages . . . for the taking or closing off of access to a highway where reasonably suitable means of access remains." United Statesv. Certain Land in the State of New Jersey, 439 F.2d 670, 673 (3d Cir. 1971). What constitutes reasonably suitable access is a question of fact. Id.
It is well known that damages resulting merely from circuity of access have been considered damnum obsque iniuria. Selig v.State of New York, 10 N.Y.2d 34, 39 (196 1). Therefore, inconvenience is not the "dispositive damage yardstick." Raj v.State of New York, 507 N.Y.S.2d 770, 771 (1986). See also,Kachele v. Bridgeport Hydraulic Co., 109 Conn. 151, 153-7,145 A. 756 (1929), which recognizes that "[a]lthough the doctrine may seem rather harsh, as applied to certain cases, there are persuasive practical reasons on which it rests." Id. at 157. It is also a factual question related to the highest and best use of the property whether it is merely circuitous (or inconvenient) or is unsuitable. Priestly v. New York, 23 N.Y.2d 152, 156 (1968). "Suitable access . . . is any access by which entrance may be made to a property without difficulty." Slepian v. New York,264 N.Y.S.2d 826, 829 (1965), rev'd on other grounds, 312 N.Y.S.2d 338 (1970). It is that which is adequate to the requirements of, or answers the needs of, a particular object. The question is inherently factual and cannot be answered in the abstract. Hronisv. Commissioner of Transportation, Super. Court, Judicial District of New London, Docket No. 502566, March 31, 1992, A. Healey, S.T.R.
This subject has already been the subject of collateral litigation between the parties. Therefore, at least some of this issue has presumably already been addressed by the Superior Court. The panel is also mindful that a willing buyer might well pay more for property which has direct access. In fact, the prior access was far more circuitous than the present direct access. The panel has not received concrete evidence that proves a serious safety hazard. While there was some testimony which evinced a clear preference for the more convenient prior arrangement, there is no evidence that the post-taking income has suffered or that parking problems have somehow affected business CT Page 7851 income. Moreover, there were no "concrete" plans presented for renovation of parking areas. In the final analysis we conclude that the issue comes down to a matter of inconvenience, and the factors on both sides of the argument appear to cancel each other out.
We have received insufficient information on the question of the Amended Certificate of Condemnation and Assessment of Benefits and Lien, and we leave that issue to the court that handled the separate injunctive action. That court accepted and entered a stipulated judgment that spawned the documents in question, and is in the best position to deal with its aftermath.
The plaintiffs submitted thirty "Claims of Law," purportedly pursuant to § 5-2 of the Practice Book. This submission reminds us of our Supreme Court's critical comments about a "shotgun" approach. See, Latham and Associates, Inc. v. WilliamRaveis Real Estate, Inc., 218 Conn. 297, 300, 589 A.2d 337
(1991); Willow Springs Condominium Association, Inc. v. SeventhBRD Development Corp. , 245 Conn. 1, 717 A.2d 77 (1998). Some claims are factual claims, some are mixed questions of fact and law, some are overlapping, and some were answered by the preceding panels whose rulings are the law of the case. The claims of law are, therefore, not "distinctly" stated as intended by Practice Book Rule 5-2. See Easton v. Easton, 172 Conn. 451,455, 374 A.2d 1090 (1977); Woodruff v. Butler, 75 Conn. 679, 682,55 A. 167 (1903); C. and C. Electric Motor Co. v. The D. Frisbieand Co., 66 Conn. 67, 79, 33 A. 604 (1898); see also Moeller and Horton, Connecticut Practice, Vol. 1, p. 344. Because the panel concludes that the thirty "claims" violate the spirit, if not the letter, of Rule 5-2, and because we view them as onerous, we decline to address them except as they are addressed by this decision. Those not addressed are overruled.
In Easton v. Easton, supra, in which the plaintiff filed fifteen "claims of law," our Supreme Court held that the court may overrule claims of law that are broad statements of law already included in the scope of accepted claims, claims of law inapplicable to the facts found, or claims which are not a full or correct statement of the law. In accord, see C. and C.Electric Motor Co. v. The D. Frisbie and Co., supra.
 IV
Fair market value is the price that a willing buyer would pay CT Page 7852 a willing seller based on the highest and best use of the land assuming, of course, that a market exists for such optimum use.Mazzola v. Commissioner of Transportation, 175 Conn. 576,581-82, 402 A.2d 786 (1978). The highest and best use of the property was in the panel's estimation, a continuation of its current use.
"[T]rial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . In condemnation proceedings the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises." French v. Clinton, 215.Conn. 197, 200-201, 575A.2d 686 (1990). See also Minicucci v. Commissionerof Transportation, 211 Conn. 382, 559 A.2d 216 (1989). The court is not, as a matter of law, bound by the valuations and valuation methods used by the appraisers, but it can consider the comparable sales of land that were in evidence, as well as the raw data used, in independently determining fair market value.Second Stone Ridge Cooperative Corporation v. Bridgeport,220 Conn. 335, 342, 597 A.2d 326 (1991). "A determination of value is, from its very nature, a matter of opinion reached by the exercise of sound judgment." DelVecchio v. New HavenRedevelopment Agency, 147 Conn. 362, 365, 161 A.2d 190 (1960). Where the usual means of ascertaining market value are lacking, other means must, from the necessities of the case, be resorted to from the best available data. Feigenbaum v. New BritainHousing Site Development Agency, 164 Conn. 254, 260, 320 A.2d 824
(1973).[10]
When only a part of a tract is taken, just compensation includes recovery for the part taken, and recovery for severance damages visited on the remainder as a necessary, natural and proximate result of the taking. Bowen v. Ives, 171 Conn. 231,238, 368 A.2d 82 (1976). The panel's job is to reach a result that, as nearly as possible, gives the plaintiffs a fair equivalent in money as just compensation for the property taken.Mathis v. Redevelopment Agency, 165 Conn. 622, 623, 345 A.2d 33, (1973).
The plaintiffs have requested severance damages for 1) furtherance of a zoning nonconformity; 2) loss of their right of way resulting in access that they claim is less safe and private and 3) problems of ponding and drainage due to a change of grade CT Page 7853 and removal of a natural watercourse; which caused the plaintiffs to expend $48,504.17 to cure the grade and install drainage. We have already discussed the plaintiffs' zoning claims and their claims relating to access. Furthermore, the previous panel of referees conclusively addressed claims regarding loss of the right of way and a separate action addressed the subject of access. This leaves the claims for loss of use because of ponding and the damages relating to curing the problem.
We must consider damages which forseeably follow from the proper construction of the project, including damages to the remainder which are a necessary, natural and proximate result of the taking. Wakeman v. Commissioner of Transportation,177 Conn. 432, 435, 418 A.2d 78 (1979). Expense that is reasonably necessary to adapt the remaining land may enter into the damages. Id. These expenses are not recoverable as such, but are evidence of elements in the decrease in market value, of which they may be an accurate measure. Id. at 436. They are considered as they affect the "after" value of the land. Plunske v. Wood,171 Conn. 280, 284-5, 370 A.2d 920 (1976).
The ponding and the money spent to cure it were a necessary, natural and proximate result of the taking; and the "costs to cure" have been considered as they affect market value. Before the plaintiffs' expenditures, the commercial enterprise was hindered by excessive water which collected on the property and froze in the winter. We do not find that the plaintiffs' loss of use of the ponding area was as total as assumed by their appraiser; but we do find that the plaintiffs are entitled to compensation for their occasional inability to use some of the property prior to the attempt to cure the problem.
The plaintiffs also claimed additional damages under General Statutes § 13a-76a for the state's unreasonable delay in taking their property. Section 13a-76a provides:
 "Whenever a referee, in determining the amount of damages for the taking of land under this part, finds that there has been unreasonable delay between the filing of a map under the provisions of section 13a-57
and the filing of a certificate of taking under section 13a-73, he may award such additional damages as he may find resulting therefrom."
We have searched our notes and the exhibits for the date of CT Page 7854 filing under section 13a- 57. There is evidence that the state held a public hearing, and there is testimony from Mr. Hayes that the plaintiffs were shown a map, but we can find no evidence of the date the state filed the required map. The plaintiffs argued that their Requests for Admissions (Exhibit 4)-unanswered-are relevant here. However, the requests are conflicting,[11] and the panel cannot, under the circumstances, determine which is correct.
It is apparent that if the Commissioner fails to file the required map, a purely literal reading of the statute could shield him from damages, even if he has successfully tied up property-perhaps even destroyed its marketability-for an unreasonable period of time. Section 13a-76a is remedial. It seeks to prevent tying up property for an unreasonable length of time-or provide the owner with compensation for it. The legislature is presumed to intend workable statutes that do not lead to absurd consequences or bizarre results. State v. Siano,216 Conn. 273, 278, 579 A.2d 79 (1990). We prefer to rely on the presumption of regularity, and we assume in the absence of contrary evidence, that the Commissioner carried out his duties under section 13a-57. "There is a strong presumption of regularity in the proceedings of a public body." Murach v.Planning Zoning Commission, 196 Conn. 192, 205, 491 A.2d 1058
(1985); and in the activities of administrators. Sekor v. Boardof Education, 240 Conn. 119, 133, 689 A.2d 1112 (1977);Metropolitan District Commission v. AFSCME, 237 Conn. 114, 122,676 A.2d 825 (1996). In our judgment damages are appropriate under section 13a-76a.
Considering the comparable sales listed by both parties, weighing the opinions of the appraisers, considering the parties' claims in light of the circumstances in evidence bearing on value, having viewed the property, and most important, utilizing our own knowledge of all the elements that pertain to value, The panel concludes that the value of the real estate before the taking was $1,497,183.00. The severance damages for the ponding and drainage problems, and for the furtherance of a zoning nonconformity amount to $86,098.00. Pursuant to Sec. 13a-76a, Conn. G.S., we have also found damages for unreasonable delay in the amount of $42,000. "If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract., before the taking and the market value of what remained of it thereafter. Severance damages to the parcel remaining are thereby included." Laurel, Inc. v. Commissioner ofCT Page 7855Transportation, 180 Conn. 11, 36. Accordingly, we find that the net value of the real property after the taking, including the severance damages, is $1,079,080.00. Therefore, we find that the plaintiffs are aggrieved and that the sum due the plaintiffs is $418,103.00 plus damages of $42,000.00 for unreasonable delay pursuant to Section 13a-76a, Conn. G.S., for a total of $460,103.00. After subtracting the $104,000.00 deposited with the court by the defendant, we have concluded that the balance due the plaintiffs for fair and just compensation is $356,103.00, plus interest. We find that reasonable and just interest may be awarded in the amount of 6% from the date of taking to the date hereof. We have approved a reasonable payment to the plaintiffs' appraiser in the amount of $12,500.00 for appraiser's fees to be included with costs.
Therefore judgment may enter for the plaintiffs in the amount of $356,103.00 plus reasonable and just interest of 6 %, from the date of taking to the date of the judgment.
The Committee
Samuel S. Freedman, Judge Trial Referee
Hugh C. Curran, Judge Trial Referee
George W. Ripley, II, Judge Trial Referre