[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On July 2, 1998, the plaintiff commissioner, pursuant to §§ 13a-73 (b) and 13a-73 (f) of the General Statutes, found it necessary to take and terminate the "rights of access [of the defendant, Jarvis Realty Company] directly to and from a portion of [p]resent Conn. Route 83, Talcottville Road, from and to a portion of land of [the defendant] said access being specifically across the southeasterly highway line of [the said highway as shown on the taking map]." The rights of access were taken as stated in the notice of condemnation because the commissioner found it "necessary for the layout, alteration, extension, widening, change of grade, and improvement" of Route 83 (also known as Talcottville Road) in the town of Vernon, under the provisions of General Statutes § 13a-73 (b), as well as for the purpose of protecting the "safety of the traveling public to and from any state highway [when in the commissioner's] judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic." General Statutes § 13a-73 (f). The defendant in this appeal asserts that the assessment of damages for the taking at $200.00 is inadequate.
At the outset of the hearing, counsel for the Jarvis Realty Company acknowledged that "[t]here is no physical taking of property here. What they've done is to eliminate a curb cut, and also the construction of a driveway over the Alice Jarvis property to the south, to direct flow in [and] out of the Jarvis Realty property." The first witness called by the defendant was Daniel O'Neil, a traffic engineer, who testified that before the taking, vehicular access to, and egress from, a bowling facility known as "Vernon Lanes" that was built in 1963 and operated by Jarvis Realty since that time, were made available to its patrons by means of three separate curb cuts to Route 83 along its frontage on the highway, but only two such driveways remained as a result of the project, which included the relocation of the former intersection of Route 83 with Wilshire Road a short distance south of the point at which that town road had previously converged with the state highway. CT Page 15782
O'Neil stated that the three curb cuts eliminated by the taking and the one curb cut remaining at the northwest corner of the property were likely to increase the number of what he referred to as "pedestrian/vehicular conflicts [which] was less desirable from a safety standpoint, as to what existed prior to the taking." He also testified on cross-examination that because one of the curb cuts was located on the abutting property there was really no loss of access because there were two means of access to the Jarvis Realty property itself both before and after the taking.
The principal engineer for the subject highway project for the department of transportation, Vincent Avino. testified that it was the department's policy to combine driveways that access highways carrying high traffic volumes such as Route 83 at its intersection with Hockanum Boulevard from the west. and that the relocation of Wilshire Road to that newly signalized intersection eliminated what would otherwise have been two unnecessarily closely spaced traffic lights. He also stated that the project caused no net loss of parking spaces, and it was his opinion that as a result "[t]he project improved the safety on Route 83 and also improved the safety of the patrons of the bowling alley."
Peter Marsele, a real estate appraiser, was called as a witness by the defendant and testified that his first appraisal of the Jarvis Realty property was made on April 3, 2000, and was subsequently revised on May 2, 2001. His valuation on both dates for the taking of access and the driveway that was to be built on property of the abutting owner on the southerly side of the subject premises and that was to extend to the Jarvis Realty property line, was $256,000, based on his opinion that the value of the building and land before the takings was $2,564,000 and their value after the takings was $2,308,000.
Marsele used the cost approach in valuing the "Vernon Lanes" building rather than the market approach because, as he stated, "[y]ou rarely, if ever, see sales of bowling alleys in the market place [and] in all my experience, I can't remember a bowling alley's ever been sold in the open market for bowling alley use." The land valuation in both of his appraisals utilized the same comparable sales of land in the adjoining town of Manchester, and he also stated in both of his written reports, as well as in his testimony, that the highest and best use to which the property could be put would be a continuation of its present use as a bowling alley complex because at the time of the taking it was still devoted to that use and had been functioning and operating as such continually ever since 1963.
Marsele's valuation of the Jarvis Realty property after the takings was CT Page 15783 based upon two factors, the first having been the reduction of the number of parking spaces from 114 spaces to 96 spaces, and the second factor, a condition claimed by the defendant to have been created by the state's construction of the driveway on the Alice Jarvis property which the defendant's traffic engineer, O'Neil, had characterized as hazardous, particularly for children attending birthday parties in a room next to an exit door at the southwest corner of building, which could be corrected by installing landscaped islands as well as a gate at an estimated cost of $15,450. The defendant's appraiser, who relied entirely on the foregoing factors and O'Neil's remediation proposal and cost estimate, concluded that as a result of the takings, there was an overall diminution in value of 10% due to the loss of an access driveway to Route #83, the elimination of 16% of the parking spaces, and the cost of parking improvements as recommended by O'Neil, and although he acknowledged that there was no market data to support his assessment of damages, he stated that his valuation was based upon his own professional experience and personal judgment.
On the third day of the trial, after the close of evidence in the Jarvis Realty case, counsel for the defendant-appellant stated that he had stopped at the "Vernon Lanes" building the night before and had discovered that Marsele's assumption that there was a party room for children at the southwest corner of the premises was no longer valid because that room had been eliminated to allow for the expansion of the cocktail lounge. Based on counsel's representation, as confirmed by the court's view' of the premises with counsel on May 8, 2002, those renovations were made in the summer of 2001, well after Marsele's second inspection and final report dated May 2, 2001.
Richard Armstrong, a project manager in the local roads section of the bureau of engineering and highway operations, who had been employed by the department of transportation (DOT) for eighteen years, testified that he was the project coordinator for the relocation of Wilshire Road and that it was his opinion that the completed driveway did not constitute a safety hazard either for motorists or for pedestrians, including children that were leaving the Vernon Lanes from either the southwest corner of the building or the main front entrance, because there was a raised concrete area that was comparable to a sidewalk, as well as a grassy area that separated them from the traveled portion of the parking area. He also stated that the circulation of traffic within the parking lot and in front of the building was virtually the same as it was before the taking, and that the changes in the traffic flow proposed by O'Neil were unnecessary because, in his words, "there are established travelways that have ample room, and also because there is a pedestrian refuge area [because of the] sidewalk immediately adjacent to the doorways." CT Page 15784
Armstrong stated that when he was assigned to the project in 1994, the town of Vernon had initiated the planned relocation of Wilshire Road and the state's role was essentially to review the scope and design of the work as it progressed to ensure that it met the appropriate standards for federal and state funding, as well as the traffic safety concerns of the town and of the commissioner of transportation. He also testified that the reason for the modification of the only curb cut remaining on the Jarvis Realty property after the taking was to limit exiting traffic to making a right turn into the northbound lane of Route 83 rather than to attempt a left hand turn to enter the highway against oncoming southbound traffic.
Michael Aletta. a real estate appraiser employed by the department of transportation, submitted his written appraisal in which he stated that on July 2, 1998, the date of the taking by the state of a right of access of 46 linear feet and the right to construct a driveway of 800 square feet, it was his opinion that the defendant was entitled to only a nominal payment of two hundred dollars because the defendant had sustained no damages as a result. An earlier valuation report dated October 28, 1996, had also come to the same conclusion, and the second appraisal by Aletta stated that the result of the acquisition and construction work would eliminate one driveway entrance from Route 83 and the modification of a second driveway entrance, and that one of the primary purposes of the road construction job was to reduce hazardous left hand traffic turns in and out of the subject property by creating the proposed driveway that would be equally accessible to motorists using the relocated Wilshire Road as well as to patrons of the bowling facility.
In both of his reports Aletta also mentioned that as a result of his discussions with town officials and a DOT engineer, the subject property would have the same or better accessibility after the acquisition than it had before, and that the parking lot and interior site traffic movement would not be adversely affected by the proposed acquisition. His appraisal utilized the market approach to estimate the vacant land value of the property (because in his opinion the building itself had not been affected by the taking), and the comparable sales that he used were all in close proximity to the subject property, including one that is also located in the town's Planned Commercial Zone, which was expressly designed to insure the safety of vehicles entering or leaving businesses along Route 83. particularly during peak traffic hours. § 4.21, Town of Vernon Zoning Regulations (1996).
Our Supreme Court has stated that "when reviewing a takings claim based upon an alleged infringement of an owner's legal right of access to CT Page 15785 property, a court must ascertain the degree to which such access is impaired by the regulatory action; see e.g., Colorado Dept. of Highwaysv. Davis. 626 P.2d 661, 664 (Cob. 1981): including the extent to which the regulation deprives the owner of a reasonably convenient and suitable means of access." Cohen v. City of Hartford, 244 Conn. 206, 221-22
(1998). The Colorado case cited in that opinion was an eminent domain proceeding that defined the term "right of access" as the right of a landowner who abuts on a street or highway to reasonable ingress and egress which may, however, "be reasonably regulated for the public safety or welfare under the police power." Id. 663-64.
Connecticut case law follows the general rule that a landowner is not entitled to compensation merely because highway changes resulting from the governmental exercise of its police power cause. him to sustain no damage other than to render access to his land more inconvenient than it formerly was, or because a more circuitous route to his property has to be taken by reason of the public improvement that altered the abutting highway. Warner v. New York, N. H. H.R. Co., 86 Conn. 561, 564
(1913). Where a condemnee needs access that is adequate to the maintenance and furtherance of its commercial business, the condemning authority must leave the owner with reasonable access to the abutting highway, but no damages will be assessed for the taking or closing off of highway access where reasonably suitable alternative means of access are found to exist by the trier of fact. W. R. Associates of Norwalk v.Commissioner of Transportation, 46 Conn. Sup. 355, 378-79 (1999).
Although Cohen v. City of Hartford, supra, 244 Conn. 206, involved a claim for injunctive relief based upon the constitutionality of a city traffic regulation, it cited the Colorado case, Colorado Dept of Highwaysv. Davis, supra, 626 P.2d 664-65, as stating the general rule that an abutting owner "is entitled to compensation for limitation or loss of access only if the limitation or loss substantially interferes with his means of ingress and egress to and from his property [and in] determining whether there has been substantial interference with a landowner's access, we have declared that inconvenience caused by the required use of a more circuitous route to gain access to property does not constitute substantial impairment of access." Id. at 664. The factual basis for the condemnee's claimed loss of access in that case is strikingly similar to the defendant's claims in this case, in that prior to the condemnation the owners of a business had two direct points of access into a state highway and after the taking the access was limited to the extent that it was necessary to travel approximately 300 feet east on a frontage road to gain access to the highway, but because the owners retained two direct points of access to the frontage road, the Colorado Supreme Court held that as a matter of law the owners' access was not substantially CT Page 15786 impaired. Id. 665.
The most recent Connecticut trial court decision concerning a partial taking of a right of highway access states that "[i]t is well known that damages resulting merely from circuity of access have been considered damnum absque injuria [and that therefore] inconvenience is not the `dispositive damage yardstick.'" W. R. Associates of Norwalk v.Commissioner of Transportation, supra, 46 Conn. Sup. 379. The owner of the business in that case was not awarded damages for its loss of access because, after noting that the valuation of any such claim was a strictly factual question of whether the access was merely circuitous or inconvenient rather than unsuitable, the court stated that it "has not received concrete evidence that proves a serious safety hazard [and that while] there was some testimony which evinced a clear preference for the more convenient prior arrangement, there is no evidence that the post-taking income has suffered or that parking problems have somehow affected business income." Id. at 379-80.
It should be noted that the defendant's valuation that was offered by its appraiser in this case was based upon the loss of parking spaces and O'Neil's proposed "cost to cure" what he mistakenly assumed was a hazardous condition for children, and that Marsele's opinion included an overall diminution in value due to the loss of an access driveway to the highway although he acknowledged that there was no market data to support his assessment of damages. O'Neil also stated in the course of his testimony that there was really no loss of access because of the newly constructed driveway and the curb cut on the nothwest side of the Jarvis Realty property itself.
While access to a public highway is a property right and its deprivation requires just compensation, the property owner is not entitled to access to his land at every point between it and the highway but only to free and convenient access to his property, and "[w]here, by virtue of state action, access is limited but remains reasonable, there is no such denial of access as entitles the landowner to compensation."State v. Van Nortwick, 617 A.2d 284-85 (N.J. App. 1992) Nor as a matter of public policy is an owner entitled to compensation by reason of the inconvenience of a more circuitous route or because of the loss of left or right turning access or egress. Id. 285-86.
It was Marsele's opinion that the loss of the preexisting access driveway from and to the highway resulted in a 10% diminution in the value of the Jarvis Realty property despite O'Neil's testimony that there was really no loss of access since there still remained two means of entering or leaving the property after the taking. one of which was the CT Page 15787 driveway that had been constructed on the abutting Alice Jarvis property and that both routes were available to patrons of the bowling facility to enter and exit the business premises by means of the newly signalized intersection, as well as the remaining driveway on the subject premises, subject only to the restriction against making hazardous left turns into the highway against oncoming traffic traveling in both directions. Although the facts of this case, as they relate to the condemnee's claimed loss of access after the taking, could reasonably justify the court in finding as a matter of law that the accessibility to the patrons of the owner's business was not "substantially impaired"; Colorado Dept.of Highways v. Davis, supra, 664-65; despite the slightly more circuitous route that would have to be taken by motorists using the driveway entering the highway from the abutting owner's former property, the underlying facts will nevertheless be considered and evaluated by the court in order to resolve this issue, based on the opinions and conclusions, as well as the personal knowledge of those witnesses who appeared to be the most well informed about the preexisting highway traffic hazards and the need for their correction.
O'Neil's proposal was designed to attempt to minimize what he perceived to be the increased traffic flow in front of the building that would be generated because of the driveway on the abutting property, but he also testified that it is quite common for shopping mall customers to drive in front of the entrances to the stores they intended to shop at without jeopardizing the safety of pedestrians or their passengers. He also acknowledged in response to a question of whether bowling patrons entering the building were safer because of the project that "[i]n a general sense, yes, it's safer [because they] have easier access because of the traffic signal [and he also agreed] that DOT accomplished its mission by making Route 83 safer for bowling alley customers coming in and out of that bowling alley."
Vincent Avino, a 32 year employee of the department of transportation whose current position is that of transportation principal engineer, worked for 11 years as manager of the new construction unit of the department that dealt with traffic designs for construction projects including traffic signals, signing, pavement markings and the maintenance and protection of traffic, and during that time he had traffic engineering responsibility for approximately 1500 projects, as well as being involved in the development of traffic engineering design standards. For the past six years he has managed and supervised one of two departmental traffic engineering units, and his major duties in that capacity include traffic reviews of major developments, dealing with traffic regulatory matters through the state traffic commission, developing potential projects to reduce the number and severity of CT Page 15788 accidents at high frequency accident locations and designing traffic signal projects and the unit that he now heads completes about 1200 to 1400 projects per year.
In his capacity as a traffic engineer he makes recommendations to designers about roadway layouts, including adjustments in the location of driveways and their attempts to combine accesses to reduce the number of points of entry and egress from state highways. One of the exhibits introduced through Avino showed that the average daily volume of traffic on Route 83 in front of Vernon Lanes was 26,200 vehicles, which was the highest volume for the entire 28 mile length of that highway from Glastonbury to the Massachusetts state line. A tabulation of the accident history at that location showed 26 accidents for the three year period from 1998 through 2000, some of which involved vehicles stopping to make a turn into the premises and other vehicles attempting to exit into the highway.
Avino also testified that the two positive aspects of the project in terms of enhancing highway safety were the reduction of the number of driveways from three to one, and the signalization of the Wilshire Road intersection which permitted motorists to enter and leave the property safely, particularly during periods of heavy traffic. In response to a question concerning the internal traffic flow which O'Neil considered to be hazardous because of what he termed "vehicular/pedestrian conflicts", Avino stated that it would be no different than a parking area in front of a commercial building or a shopping mall where pedestrians would be aware of moving vehicles and drivers would expect to see pedestrians, and it was his opinion that it was no more dangerous than parking lots provided for customers of stores or businesses of any other kind.
Richard Armstrong, the project coordinator for the relocation of Wilshire Road, began working with the Vernon town planner and the town's consulting engineers on the project which was initiated by the town rather than the state because of what he referred to as important safety concerns on the part of the town officials because of the number of access points and the potential conflicting traffic movements. It was Armstrong's opinion that the completed driveway did not constitute a safety hazard for motorists or pedestrians and that the circulation of traffic within the parking area and in front of the building was virtually the same as it was before the taking, thereby making O'Neil's proposed changes in the traffic flow unnecessary.
The testimony of the state's traffic engineers, Avino and Armstrong, is entitled to great weight because the statutory provision authorizing the commissioner of transportation to take rights of access to and egress CT Page 15789 from land abutting a highway also mandates that any such taking shall be for the purpose of protecting the "safety of the traveling public to and from any state highway or state highway appurtenances when in his judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic" General Statutes §13a-73 (f). The fact that the town of Vernon initiated the relocation of Wilshire Road. that it shared the state's concerns about traffic safety on Route 83 by creating a planned commercial zone for commercial and office space development that extended from the intersection of the highway and Dobson Road south of the subject property and ended near Dart Hill Road, well to the north of the Jarvis Realty property and that the regulation encouraged business uses which had "the least potential for generating additional traffic to the Route 83 daily and peak hour volumes [and that would insure] that the traffic ingress and egress patterns for new developments under these regulations [take] place "in a manner whichis safe and which minimize traffic conflicts resulting from turningmovements of vehicles entering or leaving the property being developed." (Emphasis added.) § 4.21, Town of Vernon Zoning Regulations (1996).
In the course of his testimony, the only traffic engineer called by the defendant acknowledged that there was really no loss of access because one of the curb cuts, although it was located on the adjoining Alice Jarvis property. permitted two means of access to the Vernon Lanes building as there had been before the taking. He also conceded that its patrons were safer in that they had "easier access because of the traffic signal [and he agreed that the department of transportation had] accomplished its mission by making Route 83 safer for bowling alley customers coming in and out of that bowling alley."
The condemning authority must leave a landowner abutting a highway "with reasonable access to the highway for his purposes where he had access immediately prior to the condemnation." United States v. CertainLand in the State of New Jersey, 439 F.2d 670, 673 (3d Cir. 1971). However, an abutting owner is not entitled to damages "for the taking or closing off of access to a highway where reasonably suitable alternative means of access remain." Id.
Based on the foregoing facts, the court rejects the valuation of the defendant's appraiser insofar as it relates to the loss of an access driveway from its property to the highway. and therefore accepts Aletta's opinion that there was no diminution of value to the subject property because the driveway on the abutting Alice Jarvis property constitutes a reasonably suitable alternative means of access. It should also be noted that Marsele acknowledged that there was no market data to support that component of his reassessment and there was no evidence offered at the CT Page 15790 hearing or claim made by the defendant that the post-taking income of the business has suffered. W. R. Associates of Norwalk v. Commissioner ofTransportation, supra, 380.
Marsele's opinion of the property's diminished value after the takings was based on two factors (other than the taking of the preexisting driveway which has been found not to have caused any diminution of the value of the condemnee's property for the above-stated reasons), namely, the defendant's claimed reduction in the number of parking spaces from 114 to 96 by reason of O'Neil's proposed "parking improvements" and his estimate of the proposed "cost to cure" what he claimed to be a particularly "hazardous condition for pedestrians using one of the entry doors to the building." The appraiser stated in response to a question about the value of a parking space that zoning regulations required at least three parking spaces for each of the thirty two alleys in the building. but he also acknowledged. as did a number of other witnesses, that "[t]he present use of these alleys do not use anywhere near the 96 spaces, or the 114 spaces."
The defendant's appraiser also testified that to the best of his knowledge the parking spaces on the Alice Jarvis property that abuts the Jarvis Realty property on the north and south had always been available for use by bowlers ever since the Vernon Lanes had built the facility in 1963. He stated that for almost forty years "they had them available to use [but] I'm not sure that they ever had to use them [and] as a matter of fact, in all the years I've known this property. I've never seen them all used. I mean, not even close to it."
In response to a question as to whether there was any standard utilized by appraisers that permitted them to evaluate risks of injury to persons such as pedestrians or drivers, Marsele stated that such opinions could not be given by appraisers. He acknowledged that an appraiser did not have the expertise of an engineer and that he knew of no accidents on the property since the taking in 1998.
The appraiser for Jarvis Realty expressed the opinion throughout the hearing and noted in his reports that the highest and best use for the subject property would be a continuation of its present use as a bowling alley complex because it had been functioning and operating as such continually since 1963. Although the parties disagreed on the number of parking spaces that had been lost because of the proposed "parking improvements" and Marsele later in his testimony "adjusted" his damages when he conceded that only nine rather eighteen spaces would be lost, the court concludes that the "loss" of spaces is noncompensible because it is undisputed that the present and reasonably foreseeable use of the CT Page 15791 property involves only about one-quarter of the designated parking area and that. in any event, there was no evidence "that parking problems have somehow affected business income." W. R. Associates of Norwalk v.Commissioner of Transportation, supra, 380.
Counsel for the plaintiff acknowledged in the course of the trial that his engineer's proposed remedial proposal was based primarily on an incorrect assumption that child pedestrians would be at risk because of the interior site traffic movement generated by the new access driveway. The court finds that the testimony of the state's traffic engineers. Avino and Armstrong. that the driveway that was constructed on the abutting property did not constitute a safety hazard for motorists or pedestrians and that the circulation of traffic within the parking area and in front of the building was virtually the same as it had been before the taking, is both credible and persuasive.
Accordingly, the appeal taken by the defendant, Jarvis Realty Company, for the reassessment of damages is denied, and the commissioner's nominal assessment of damages of $200.00 is affirmed.
 Harry Hammer Judge Trial Referee
CT Page 15792